No. 25-10987

**In the United States Court of Appeals
for the Eleventh Circuit**

———————————————

Jessica Guasto (n/k/a Jessica Salabarria),

*Appellant*

v.

The City of Miami Beach, FL,

*Appellee.*

On Appeal from the United States District Court
for the Southern District of Florida, Miami Division
Case No. 22-1004-CIV-DAMIAN, Hon. Melissa Damian

———————————————

**APPELLANT'S INITIAL BRIEF**

———————————————

Michael J Ellis
Alexander Appellate Law P.A.
1022 Park Street, Suite 206
Jacksonville, FL 32204
(689) 259-5010
michael@alexanderappeals.com
*Counsel for Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, counsel of record for Jessica Salabarria (f/k/a Jessica Guasto) certifies that, to the best of his knowledge, the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the case or this petition, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

I. Corporate Disclosure Statement

> Neither corporation is owned by any publicly traded company, nor is either corporation publicly traded. Pursuant to 11th Cir. R. 26.1-3(b), no publicly traded company or corporation has an interest in the outcome of this appeal.

II. Certificate of Interested Persons

1.   Alexander Appellate Law P.A.

2.   Alexander, Samuel, Esq.

> c/o Alexander Appellate Law P.A.

C-2

3.   Braun, Benjamin

4.   City of Miami Beach, Florida

5.   Clements, Richard

6.   Cosner, Steven

7.   Damian, Melissa

8.   Daragjati, Paul

9.   Derek Smith Law Group PLLC

10.  Elkins, Michael

11.  Ellis, Michael J

12.  Gayle, Darrin P

13.  Guasto, Jessica (n/k/a Jessica Salabarria)

14.  Hunnefeld, Henry

15.  MLE Law

16.  Paz, Rafael A

17.  Torres, Edwin G

August 15, 2025                                                    /s/ Michael J Ellis
                                                                   Michael J Ellis

C-3

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. In-court argument never occurred below, as the district court entered summary judgment on the papers. Oral argument would be helpful to this Court's accurate, thorough understanding of the evidence of this single-issue appeal.

The record evidence below is voluminous and nuanced. The undersigned would appreciate the opportunity to address that evidence with this Court during oral argument.

Also, there is a potentially novel question of law involved: whether, in a retaliation claim under Title VII, an employer's conditioning continued employment on an employee's dismissal of pending EEOC charges can constitute evidence of pretext when the employee *agrees* to the quid-pro-quo arrangement.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .........................................C-2

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF CITATIONS ...................................................................... iii

STATEMENT OF JURISDICTION.........................................................v

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT...............................................................20

STANDARD OF REVIEW ...................................................................22

ARGUMENT .......................................................................................22

    I.    There Was Sufficient Evidence of Pretext to Send
        Ms. Salabarria's Retaliation Claim to a Jury.......................22

        A.    Two Points of Fact Must be Made Clear Before
              Analyzing Pretext. .....................................................24

        B.    The Conditioning of Ms. Salabarria's Continued
              Employment Under the LCA on Dismissal of Her
              EEOC Charge Makes Pretext a Jury Question...........26

        C.    The City's Deviations from Protocol to Bring
              About The LCA—and Then Termination
              Pursuant to the LCA—Makes Pretext a Jury
              Question.....................................................................32

CONCLUSION.....................................................................................35

CERTIFICATE OF COMPLIANCE ......................................................37

CERTIFICATE OF SERVICE ..............................................................38

ii

# TABLE OF CITATIONS

## Cases

*Baskerville v. Sec'y of Dep't of Veteran Affairs*
No. 6:18-CV-1728-WWB-DCI,
2021 WL 1338203, at *2 (M.D. Fla. Feb. 8, 2021) .................. 27, 28, 29

*Brazell v. Hillsborough Cnty. Bd. of Cnty. Commissioners,*
522 F. Supp. 3d 1165 (M.D. Fla. 2021) ............................................... 29

*Chapter 7 Tr. v. Gate Gourmet, Inc.,*
683 F.3d 1249 (11th Cir. 2012) ..................................................... 26, 28

*Connelly v. WellStar Health Sys., Inc.,*
758 Fed. Appx. 825 (11th Cir. 2019) ........................................ 32, 33, 35

*Goldsmith v. Bagby Elevator Co., Inc.,*
513 F.3d 1261 (11th Cir. 2008) ..................................................... 26, 28

*Guevara v. Lafise Corp.,*
127 F.4th 824 (11th Cir. 2025) ............................................................ 22

*Jefferson v. Sewon Am., Inc.,*
891 F.3d 911 (11th Cir. 2018) ............................................................. 22

*Knox v. Roper Pump Co.,*
957 F.3d 1237 (11th Cir. 2020) ......................................... 23, 26, 27, 29

*McDonnell Douglas,*
411 U.S. at 802 n.13 ......................................................... 19, 20, 22, 35

*Patterson v. Georgia Pac., LLC,*
38 F.4th 1336 (11th Cir. 2022) ........................................................... 23

*Price v. Time, Inc.,*
416 F.3d 1327 (11th Cir. 2005) .......................................................... 22

*Rojas v. Florida,*
285 F.3d 1339 n.4 (11th Cir. 2002) ......................................... 32, 33, 35

*Simmons v. Camden Cnty. Bd. of Educ.,*
757 F.2d 1187 (11th Cir. 1985) .......................................................... 23

*University of Texas Southwestern Medical Center v. Nassar,*
570 U.S. 338 (2013) ........................................................................... 23

iii

*Wellons v. Miami Dade Cnty.*,
   611 Fed. Appx. 535 (11th Cir. 2015).............................................32, 33

## Statutes

28 U.S.C. § 1291.................................................................................v

42 U.S.C. § 2000................................................................................v

## Rules

Fed. R. App. P. 28 .............................................................................v

## STATEMENT OF JURISDICTION

As required by Federal Rule of Appellate Procedure 28(a)(4), Appellant provides the following statement of jurisdiction.

The district court possessed subject matter jurisdiction (federal question jurisdiction) over Ms. Salabarria's claim against the City of Miami Beach (the "City") alleging a violation of 42 U.S.C. § 2000e (Title VII), and a violation of 42 U.S.C. § 1983. And the district court had supplemental jurisdiction over the state law claims alleging discrimination under the Florida Civil Rights Act.

Under 28 U.S.C. § 1291, this Court has jurisdiction to review the final order granting summary judgment, DE 108, and attendant judgment, DE 109, in favor of the City. The district court entered judgment on February 24, 2025, and Ms. Salabarria timely filed the notice of appeal on March 24, 2025.

August 1, 2025 was the deadline for Ms. Salabarria's opening brief. This appeal was dismissed on August 4 for want of a brief. Thus, the appeal is presently postured in a dismissal stance and the undersigned is requesting reinstatement of this single-issue appeal. The motion for reinstatement is ***unopposed***.

Extraordinary circumstances support reinstatement. 11th Cir. R. 42-2(e). Due to the unique way that mediation ended, the undersigned (for whom this is the first appeal in the Court of Appeals for the Eleventh Circuit) was in doubt as to whether mediation had technically impassed on the mediation date of July 11. Without revealing mediation communications, which is prohibited under 11th Cir. R. 33-1(c)(3), the undersigned can say that on July 25 the undersigned and the City agreed (in writing) that "mediation had technically not impassed" because of ongoing "follow up" sessions. Ultimately, we were both mistaken.

The mediator had apparently filed a report stating that mediation had impassed as of July 11. But because the undersigned believed that mediation had not impassed, and did not know a report to the contrary had been filed, the undersigned requested a mediation-based extension instead of simply calling the clerk's office to request a first extension. The undersigned was then very surprised to learn that in the 11th Circuit's eyes, mediation had been declared an impasse and no mediation-based extensions were available. The undersigned was not able to respond to the order that same day, rendering further extensions impermissible.

In sum: the undersigned was aware of the briefing deadline, was actively drafting the brief ahead of the deadline while balancing those efforts with ongoing settlement talks, but ultimately made a request to extend the briefing deadline in the *wrong manner* and did not realize the mistake before the briefing deadline had already passed.

These extraordinary circumstances, this Court's "strong policy of determining cases on their merits," and the opposing party's lack of opposition to reinstatement, all favor a reinstatement of this appeal. *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003).

vii

## **STATEMENT OF THE ISSUES**

1. Whether a reasonable juror could conclude that Ms. Salabarria's exercise of protected activity (and not the City's stated reason) was the but-for cause of her termination—*i.e.*, whether a juror could find the City's articulated reason for her termination was pretextual.

   a. Whether an employer conditioning continued employment (under a Last Chance Agreement) on an employee dismissing an EEOC charge constitutes evidence of pretext where the employee *accepts* the Last Chance Agreement, drops the EEOC charge, and is fired pursuant to the Last Chance Agreement on grounds with which the employee disputes.

1

## STATEMENT OF THE CASE

Employment Timeline

In January of 2012, the City of Miami Beach (defendant, hereinafter the "City") hired Ms. Salabarria (Plaintiff/Appellant) as a police officer. DE 71¶1. She was 20 years old when hired. DE 78 ¶87.

Because Ms. Salabarria's male coworkers found her physically attractive, she was shown pornographic images on several occasions and suffered unwanted sexual advances routinely. DE 1; DE 78 ¶¶86-88. In 2014, she was even criminally stalked (by another officer, Sergeant Estrevez). DE 69-17 Tr. 52:1-54:3.

Ms. Salabarria was in the same "squad" as Lieutenant Steven Cosner ("Cosner") when she suffered the stalking from another office named Estrevez. DE 69-17 Tr. 52:4-13. Fresh on the heels of those unwanted and criminal sexual advances, Cosner began making sexual advances against Ms. Salabarria in 2014. DE 78 ¶¶86-88.

Cosner was in his 40's; Ms. Salabarria was 22. DE 69-17 Tr. 52:1-54:3. Cosner's tenure vastly exceeded Ms. Salabarria's. *Id.* At that time, Ms. Salabarria was a rookie scared of making enemies with someone (like Cosner) who had "a lot of influence" politically given his long "tenure" on

2

the force. DE 69-17 Tr. 52:1-54:3. She was especially "scared" of offending Cosner because she did not want to create a reputation for herself as being someone who would quickly "bring up complaints of sexual harassment." DE 69-17 Tr. 53:10-15. All she "wanted was to just to go and do [her] job and be left alone." DE 69-17 Tr. 67:3-11.

Cosner "gifted" Ms. Salabarria the following vulgar Valentines' Day card in 2014, during which time he claims to have had a romantic relationship with Ms. Salabarria:



DE 69-6, Exhibit 1.

In April of 2014, Cosner—who was married, but separated from his wife at the time—gave Ms. Salabarria a birthday card calling her "my princess" and "babydoll" and thanking her for coming into his life. DE 69-6, Tr. 31:4-8. His feelings for Plaintiff were strong enough to be a "catalyst" to finalize his divorce with his wife. DE 69-6, Tr. 34:11-20.

Cosner became "fed up" with Ms. Salabarria when he believed she was romantically involved with another man, and so he decided he would no longer "pursue" Ms. Salabarria in mid-2014. DE 69-6, Tr. 32:18-33:5.

Ms. Salabarria testified unequivocally that she <u>never</u> had any romantic relationship with Cosner. DE 69-17, Tr. 51:23-25. Once Cosner "crossed the line and couldn't take no for an answer" from Ms. Salabarria any further, Ms. Salabarria explicitly told Cosner to stop. DE 69-17, Tr. 53:16-21. Thereafter, Cosner stopped speaking to her completely, and would not even *look* at her; she believes Cosner's palpable "animosity" and "vendetta" eventually "culminated" in Cosner reporting her for misconduct in December of 2020—right before Ms. Salabarria married Nicolas Guasto, another City officer. DE 69-17 Tr. 53:16-5:2.[1]

---

[1] Ms. Salabarria is sometimes referred to as Jessica *Guasto*. Ms. Salabarria and Mr. Guasto began dating August of 2019 and were married from January 2021 to June 2023. DE 78. ¶91.

4

First EEOC Charge: August 2018

In August 2018, Ms. Salabarria filed the first (of three) EEOC charges. DE 71 ¶2. She alleged discrimination following demotion (from Sergeant to Officer) which the City justified based on performance issues. *Id.* Ms. Salabarria explained that she suffered an adverse employment action because of a pending internal investigation, even though at least one other male sergeant was <u>not</u> demoted despite also having a pending internal investigation. *Id.*

In September of 2019, Ms. Salabarria, the City, and the Fraternal Order of Police ("FOP") Lodge No. 8 executed a settlement agreement of the first EEOC Charge. DE 69-7, Exhibit 7. Ms. Salabarria dismissed the first EEOC charge in exchange for reinstatement as Sergeant. *Id.*

Second EEOC Charge & Chief Clements' Misinformation Scheme

In April 2020, Ms. Salabarria became subject to an Internal Affairs Complaint (the "IA Complaint") alleging non-presence during shift during the COVID pandemic. DE 69-8, Exhibit B. Mr. Guasto, Ms. Salabarria's then-fiancé, was also subject to internal affairs investigation based on the same facts. Chief Clements permitted Mr. Guasto to return

to work *before* his IA investigation was resolved. DE 78-3 ¶6. Ms. Salabarria was not extended the same privilege.

In July of 2020, Ms. Salabarria filed her second EEOC charge alleging a variety of improprieties constituting retaliation and harassment under Title VII. DE 69-9.

In September of 2020, while Ms. Salabarria's second EEOC charge remained pending, Chief Clements repeatedly tried to cajole Ms. Salabarria into dropping her EEOC charge—*through* Mr. Guasto, Ms. Salabarria's fiancé. DE 78-3 (declaration of Nicholas Guasto).

First, because Mr. Guasto was so grateful for being allowed to return to work *before* his IA investigation was completed, he sought out Chief Clements to thank him personally. *Id.* at ¶¶5-6. Eventually, Chief Clements "steered the conversation" with Mr. Guasto towards the subject of Ms. Salabarria's pending EEOC charge, stated that he was under institutional pressure to fire Ms. Salabarria, and told Mr. Guasto to "work[] with him" to find a solution. DE 78-3¶6.

Then a week later, Chief Clements "again asked for [Ms. Salabarria's] 2020 EEOC charge to be dropped in return for lesser punishment." *Id.* at ¶¶7-8.

Later that same day, Chief Clements—through a third party—asked Mr. Guasto if he could report to the police station to have a meeting. Mr. Guasto described that meeting as follows:

> At this meeting, the Chief again insisted that [Ms. Salabarria's] 2020 EEOC charge be dropped and that he would be able to reduce discipline and resolve the case amicably for both Jessica and me. He told me that we should not even be meeting, and that he will deny it if anyone asks, but that he had figured out a way to resolve the case. He told me he wanted to address all of Jessica's concerns about harassment because he understands what she has been through and wanted to help. He echoed the concerns that Deputy Chief Wayne Jones made to me during a previous meeting, that the department had failed Jessica and that the treatment she has received is disgusting and despicable.

DE 78-3 ¶9.

Chief Clements then proselytized to Mr. Guasto an elaborate, roundabout plan of communication that would give all lawyers involved the impression that Ms. Salabarria had come up with the idea of dropping her EEOC charge in exchange for dismissal of her IA complaint and LCA:

> Chief Clements told me that Jessica and I needed to contact her attorney, Michael Pancier, and tell him that *she wanted to dismiss the 2020 EEOC charge and handle the case internally*. Chief Clements said we needed to tell Pancier that we thought there was an opportunity to *resolve the IA*

> *case and the EEOC charge <u>simultaneously</u>* but that we hadn't spoken to the Chief yet. He anticipated Pancier would call Miami Beach City Attorney. . . and advise of such, and [the City Attorney] would call Clements who would then agree to the meeting to resolve the cases. . . . Again, Clements stressed the importance of dismissing the EEOC charge, in exchange for this consideration.

*Id.* at ¶10 (emphasis added).

About a week later, Chief Clements—again via third parties—contacted Mr. Guasto. *Id.* at ¶13. The third party stated that Clements was "angry," wanted to speak right away, and that Clements would be calling from the third party's line to avoid Clements' number being on Mr. Guasto's call history. *Id.* When Mr. Guasto answered the call, he was "immediately attacked and yelled at by Chief Clements" and Clements "accus[ed Mr. Guasto] of getting him in trouble with [the City's outside counsel] because [the City's outside counsel] thought we had spoken about the case, <u>which we had</u>." *Id.* at 14 (emphasis added).

<u>Second Settlement, Last Chance Agreement, and Dropped EEOC Charge</u>

In November of 2020, the parties held a meeting regarding the IA Complaint and second EEOC charge. DE 69 ¶¶ 15-24. A month later, the parties (Ms. Salabarria, FOP Lodge No. 8, and the City) executed a

8

settlement package consisting of: (1) a Last Chance Agreement ("LCA"), (2) a Settlement Agreement ("Settlement"). DE 71-4.

As Chief Clements had wanted for months, Ms. Salabarria's IA Complaint and second EEOC charge were resolved simultaneously. DE 71-4. Under this agreement, Ms. Salabarria agreed to dismiss the second EEOC charge in exchange for continued employment under the Last Chance Agreement ("LCA"). *Id.*[2]

The LCA was executed contemporaneously with the second settlement and was incorporated into the Settlement. DE 71-4. In the LCA, and both parties agreed to be bound by the following terms:

> . . .
>
> 2.  During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

---

[2] Ms. Salabarria also agreed to a 160-hour suspension, recognition of misconduct, and approximately $3,500 paid to the City. *Id.*

9

3. Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures (""SOPs"") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference. In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4. The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. <u>The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review</u>.

5.   Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures (""SOPs"") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. <u>It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation.</u> *In that event, the Employee*

10

*and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.*

. . .

9.  *Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement.*

. . .

. . .

12.  In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13.  The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this

11

Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

. . .

15.  SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

. . .

18. SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.  Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20. This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

. . .

22.  In the event that any party to this Last Chance Agreement institutes legal proceedings regarding

the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida. SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.

DE 71-4 (emphasis added; capitalization in original).

Critically, the Settlement Agreement executed contemporaneously with the LCA contains a provision mandating dismissal of Ms. Salabarria's second EEOC charge. DE 71-4 at pp.1-2.[3]

First Shift Back: Cosner's Complaint

During Ms. Salabarria's very first shift back, the City assigned her the graveyard shift (12 AM – 6:00 AM) with none other than Cosner, her spurned admirer from yesteryear, as shift supervisor. DE 78 ¶96.

Cosner, who himself that very shift "forgot" to send Salabarria her shift duties until approximately 4:00 AM, reported Ms. Salabarria for

---

[3] Although the City's HR Director stated that LCA's are "not rare" in that "42" of them had been issued between 2015-2022, the record evidence shows no indication of any other employee (other than Ms. Salabarria) waiving their right to continue engaging in statutorily protected activity in exchange for continued employment. DE 69-30, ¶¶38-47.

13

neglecting her own obligations, citing her for a dozen departmental rule violations during that single shift alone. DE 78 ¶¶96-99.

The manner in which Cosner reported Ms. Salabarria deviated from departmental protocol/norms in several ways. For example, Cosner reported Ms. Salabarria by completing an administrative action form ("AAF"). *Id.* But the alleged rule violations should've been reported in an "Allegation of Employee Misconduct Form," not an AAF. DE 69 ¶¶41-42. Cosner knew that filing an AAF would likely lead to discipline for Ms. Salabarria. DE 78 ¶99; DE 69-6, Exhibit 4.[4]

Also, instead of submitting the allegations through chain of command, Cosner submitted the AAF directly to the City's outside counsel and commander of Internal Affairs. DE 78 ¶107. When Cosner was asked in deposition "why he sent" the AAF to the City's outside counsel—instead of to internal affairs—the City asserted an attorney-client privilege objection and Cosner stayed mum. DE 69-6, Tr. 55:6-25.[5]

---

[4] Cosner claims was unaware of Ms. Salabarria's LCA and EEOC Charge when he filed an AAF against her. DE 69 ¶50.

[5] The City agrees that Cosner used the wrong form. DE 69 ¶42.

14

Ms. Salabarria testified that Cosner *knew* she was on LCA when he reported her. DE 69-17, Tr. 109:7-111:18. She explained that it was a "common occurrence" for her EEOC charge and LCA to be subject of "open" conversations in the police station amongst coworkers—one of whom was Cosner, who sat directly "in back of" Ms. Salabarria's desk during the frequent conversations which were "loud enough" for him to hear. *Id.* Cosner never told Ms. Salabarria point-blank, "I know about your LCA and/or EEOC charge" but Ms. Salabarria inferred that he knew because her situation "was common knowledge throughout the whole station" given the open, frequent discussions near Cosner's desk. *Id.*

Cosner disclaimed knowledge of Ms. Salabarria's EEOC charge and/or LCA, making this a disputed fact. DE 69-6, Tr. 147:4-17. The City later asserted that Ms. Salabarria "does not have any evidence that Cosner knew about her 2020 EEOC charge or her [LCA]," DE 69 ¶¶50-51, which is not exactly accurate considering the existence of Ms. Salabarria's sworn, contrary testimony. DE 69-17, Tr. 109:7-111:18.

In January of 2021, Police Chief Clements convened a meeting with FOP personnel, Commander of Internal Affairs, and Cosner regarding the reported misconduct of Ms. Salabarria. DE 69-32, Tr. 219:3-220:3.

15

The FOP Union President at the time (Paul Ozaeta) testified that Chief Clements explicitly stated that he "didn't want the FOP attorney present" during the meeting with Ms. Salabarria. DE 69-23, Tr. 49:2-14. Even before the meeting began, Chief Clements had made his mind up that, based on Cosner's allegations alone, he believed he had sufficient grounds to terminate Ms. Salabarria. DE 69-23, Tr. 48:13-49:1.

Ms. Salabarria claims she was denied her request to be represented by a representative of her choice at the January 2021 meeting. DE 78 ¶58.[6] Ms. Salabarria was ultimately terminated. Cosner was not the decision-maker regarding Ms. Salabarria's termination; Chief Clements was the decision-maker. DE 69 ¶66.

Third EEOC Charge: This Litigation

In June of 2021, Ms. Salabarria filed the third EEOC charge, on which this suit is predicated. The subject EEOC charge alleges:

> Additional respondents responsible for discriminatory conduct: Rick Clements, Chief of Police Miami Beach Police Department; Wayne Jones, Deputy Chief Miami Beach Police Dept.; Lt. Steven Cosner, Miami Beach Police Dept. Cmdr.; A.J. Prieto, Miami Beach Police Dept.

---

[6] The City asserts that Ms. Salabarria never requested such representation. DE 69 ¶56.

16

Charging Party (CP) is a female and was employed by the Responding Party (RP) in a supervisory position. CP has filed two previous EEOC charges against the RP, the first in 2019 after the CP was inappropriately demoted, and the second in 2020 after continuing discriminatory conduct by the RP after reinstatement to her supervisory position. The 2019 charge was resolved with the R reinstating the CP to her supervisory position.

CP filed the second EEOC complaint in July 2020. RP initiated an internal investigation regarding work rule violations in May 2020. In December 2020, a meeting was held where the RP threatened to terminate CP's employment with RP for the alleged work rule violations, even though similar employees were given lesser penalties for equivalent alleged conduct. In exchange for withdrawing her charge with the EEOC, the RP gave CP equal punishment to other employees, but also had CP sign an agreement waiving her job security rights under the collective bargaining agreement and forcing CP to sign a letter of resignation.

On the first day back to work after CP signed the agreement, Respondent Cosner [sic], who was previously involved in the conduct leading to the 2020 charge, accused CP of further violations of workplace rules. The R[P] conducted a perfunctory investigation, led by Respondent Prieto. On January 19, 2021, Respondents Clements, Jones, Cosner and Prieto attended a meeting with CP to "discuss the allegations" against CP. In that meeting, the Respondents accused CP of falsifying documents without cognizable evidence. On January 25, 2021, Respondent Clements notified

17

CP that the RP was "implementing" the letter of resignation and terminated CP's employment.

CP was terminated for engaging in a protected activity, filing the 2020 charge of discrimination and retaliation against RP. The RP's act in threatening more severe penalties for similar alleged conduct, compelling CP to agree to waive her rights under the collective bargaining agreement and the subsequent Cosner allegation of misconduct were merely pretext for discrimination and retaliation.

[Boilerplate request for relief redacted].

DE 1-1.

Ms. Salabarria's complaint alleged ten claims, most of which were dismissed at the pleading stage, leaving only Count III (retaliation under Title VII) and Count VI (retaliation under FCRA). *Compare* DE 1 (complaint), *with* DE 32 (dismissal order).

Notably, a key reason the district court denied dismissal of Count III (retaliation under Title VII) was because Ms. Salabarria alleged that Cosner "knew about the Settlement Agreement and the included LCA." DE 32 p.12. The allegation that Cosner *knew* satisfied the legal requirement that there be a causal connection between the adverse employment action and the protected conduct. *See id.* ("Based on these allegations, a reasonable person could conclude that Plaintiff's

18

termination was related to her discrimination and harassment claims. Therefore, Counts III and IV may proceed.").

Summary Judgement

The City's summary judgment motion argued that Ms. Salabarria failed to make a prima face retaliation case, and that the City articulated a legitimate reason for firing her in 2021, which was not pretextual. DE 70 p. 3. Ms. Salabarria opposed. DE 79. The City filed a reply. DE 83.

The district court analyzed Ms. Salabarria's claims under both *McDonnell Douglas*, 411 U.S. at 802 n.13, and the alternative "convincing mosaic" standard. DE 70. The district court concluded that, contrary to the City's lengthy argument otherwise, Ms. Salabarria did present a *prima facie* case of retaliation. DE 70 pp. 16-19. All three prongs were satisfied: Ms. Salabarria (1) engaged in protected activity, and (2) suffered an adverse employment action, and (3) the adverse employment action was not "wholly unrelated" to the protected activity. *Id.*

The district court then concluded the City had a legitimate, non-retaliatory reason for firing Ms. Salabarria, *Id.* at pp. 19-21, meaning the burden of production shifted back to Ms. Salabarria to raise a jury question as to pretext. *Id.* at pp. 19-27. The district court concluded she

19

failed to do so. Notably, the district court rejected the theory that Cosner's motivations could constitute pretext because it concluded he was "unaware of her second EEOC charge or her LCA" when he reported Ms. Salabarria. *Id.* at 27.

## SUMMARY OF ARGUMENT

The district court properly concluded that (1) Ms. Salabarria raised a prima facie case of retaliation, and (2) the City articulated a plausibly legitimate, non-retaliatory reason for her firing. Therefore, the only question before this Court is the tertiary pretext question: whether a reasonable juror could conclude that Ms. Salabarria's exercise of protected activity was the but-for cause of her termination. A reasonable juror could answer in the affirmative, so reversal is required under the *McDonnell Douglas* framework and the "convincing mosaic" framework.

There is enough evidence of pretext to go to a jury. For example, based on the record evidence, it appears that Ms. Salabarria is the only employee with whom the City has ever conditioned dismissal of an IA Investigation on dropping a pending EEOC charge. That's notable.

It's also notable that the LCA and Settlement Agreement were instituted only *after* Chief Clements championed a misinformation

20

campaign aimed at circumventing all lawyers and cajoling Ms. Salabarria into agreeing to continued employment under an LCA. The LCA put her on thin ice. And it was pursuant to that same LCA that she was summarily fired on her very first shift back after being reported (for minor infractions) by a spurned admirer, Cosner.

The LCA—not the rule violations themselves—are what guaranteed her termination. Indeed, several witnesses testified that she would not have been fired for such minor infractions unless the LCA had been in place, making the circumstances surrounding the establishment of the LCA almost more critical to the overarching pretext inquiry than the actual grounds for firing.

Even if it was permissible for the City to predicate continued employment under an LCA on dismissal of EEOC charges, the (1) very act of conditioning continued employment on dismissing an EEOC charge, and (2) great lengths to which the City went to condition continued employment on dismissal of an EEOC charge, indicate that Ms. Salabarria's eventual firing pursuant to that LCA was retaliatorily motivated by her exercise of protected activity. The LCA was a means to an end: worry-free termination of an employee who speaks out against

21

discrimination. All of this, under *McDonnell Douglas* or otherwise, creates a triable issue of fact as to pretext.

## STANDARD OF REVIEW

On de novo review of a summary-judgment order, this Court asks the same question the district court asked below: when construing all the facts and reasonable inferences in favor of Ms. Salabarria (non-movant), could a reasonable juror conclude Ms. Salabarria's exercise of protected activity was the but-for cause of her termination—*i.e.,* could a reasonable juror find the City's articulated reason was pretextual? *See Guevara v. Lafise Corp.*, 127 F.4th 824, 828 (11th Cir. 2025); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018); *see also Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").

## ARGUMENT

### I.    There Was Sufficient Evidence of Pretext to Send Ms. Salabarria's Retaliation Claim to a Jury.

A prima facie case of retaliation exists where a plaintiff suffers an adverse employment action, which adverse employment action was not wholly unrelated to plaintiff's statutorily protected activity. *Knox v.*

*Roper Pump Co.,* 957 F.3d 1237, 1245 (11th Cir. 2020); *Simmons v. Camden Cnty. Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir. 1985); *Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022).

Below, the district court properly concluded that (1) Ms. Salabarria raised a prima facie case of retaliation, and (2) the City articulated a plausibly legitimate, non-retaliatory reason for her firing. DE 108.

Thus, on appeal, the only question is whether a reasonable juror could conclude that Ms. Salabarria's exercise of protected activity was the but-for cause of her termination—not the City's stated reason. *Knox v. Roper Pump Co.,* 957 F.3d 1237, 1245 (11th Cir. 2020) (articulating summary-judgment standard of review as applied to retaliation claim); *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 362 (2013) (holding that but-for causation is the causation standard for retaliation claims). The district court answered in the negative and entered summary judgment on pretext. But because a reasonable juror *might* conclude that a but-for cause of termination was the City's retaliation for filing an EEOC claim, this Court should reverse. As shown below, the evidence cumulatively creates a jury question on pretext.

23

**A.    Two Points of Fact Must be Made Clear Before Analyzing Pretext.**

Two preliminary points of fact about the subject adverse employment action inform the rest of this pretext-focused appeal. Both pertain to the LCA and the context surrounding its creation.

**First**, but for Ms. Salabarria being under an LCA, the rule violations Cosner reported her for in December 2020 would <u>not</u> have resulted in Ms. Salabarria's termination. Testimony from the top brass bears this out. The then-FOP Union President (Paul Ozaeta) testified that, "without a last chance agreement" in place, he does not believe that the "violation in question from that incident rose to the level of termination." DE 69-23, Tr. 65:1-11. Similarly, a FOP VP testified that he "didn't feel like the violation met the need for termination until . . . it was made known to [him] . . . that there was a last chance agreement" in place. DE 69-24 Tr. 66:2-6. Likewise, Chief Clements testified that he "didn't have to have that [January 2021] meeting" with Ms. Salabarria simply because "there was a last chance agreement that [he] could have just implemented" summarily. DE 69-16 Tr. 96:1-7.  So, without the LCA in place, Ms. Salabarria would not have been fired for the December 2020 violations. But the LCA put her on thin ice.

This fact is critical on appeal. Because the LCA was integral to the City's decision to fire Ms. Salabarria, and because the "pretext" inquiry asks whether a but-for cause of the City's decision to fire her was animus against her EEOC charge, the circumstances surrounding the LCA are inextricably intertwined with the overarching pretext analysis. Thus, the City's decision to fire Ms. Salabarria pursuant to the LCA is critical, but so too are all the circumstances relating to the creation of the LCA itself.

And, **second**, the LCA and Settlement Agreement were instituted only *after* Chief Clements concocted an elaborate misinformation scheme designed to give all lawyers involved the impression that (1) Ms. Salabarria herself had come up with the idea of dropping her EEOC charge in exchange for dismissal of her IA complaint and creation of the LCA, and (2) that Chief Clements had <u>not</u> had backchannel communication with Ms. Salabarria (through third parties) about her EEOC charge. DE 78-3 ¶¶6,7-12, 13-16. Chief Clements' long campaign to get Ms. Salabarria to drop her pending EEOC charge worked. She dropped the EEOC charge under the LCA and Settlement.

In a sense, the facts surrounding the LCA—pursuant to which Ms. Salabarria was terminated—are more indicative of pretext than are the

25

facts surrounding the actual termination. Ultimately, the LCA in this case is the north star of the pretext analysis.

## B. The Conditioning of Ms. Salabarria's Continued Employment Under the LCA on Dismissal of Her EEOC Charge Makes Pretext a Jury Question.

When an employer tries to condition continued employment on an employee dropping a pending discrimination claim, that is evidence of pretext sufficient to withstand summary judgment. *See Knox v. Roper Pump Co.*, 957 F.3d 1237, 1246 (11th Cir. 2020) (reversing order granting summary judgment on retaliation claim because of employer's coercive use of an LCA); *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1260 (11th Cir. 2012) (reversing order granting summary judgment on retaliation claim where employer told pregnant employee that she could attain a desired light-work position if she "dropped the [EEOC] charge"); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1268 (11th Cir. 2008) (reversing order granting judgment as matter of law on retaliation claim where employee was fired after refusing to drop his pending EEOC charge to remain employed).

Below, Ms. Salabarria raised this argument through *Baskerville v. Sec'y of Dep't of Veteran Affairs* No. 6:18-CV-1728-WWB-DCI, 2021 WL

26

1338203, at *2 (M.D. Fla. Feb. 8, 2021) (citing *Knox*).[7] In *Baskerville*, summary judgment was denied as to pretext where the employer offered an employee an LCA in exchange for the employee dropping his pending EEOC claims. No. 6:18-CV-1728-WWB-DCI, 2021 WL 1338203, at *2 (M.D. Fla. Feb. 8, 2021). The *Baskerville* plaintiff (like Ms. Salabarria) had "filed various EEOC complaints" alleging discrimination over the years. *Id.* at *1. After plaintiff's "verbal altercation with another co-worker," the employer drafted an LCA and asked the plaintiff to sign it and drop the pending EEOC charge. The "plaintiff declined to sign the [LCA] . . . and was ultimately terminated" due to the verbal altercation. *Id.* at *2. Notably, the employer conceded that the LCA "was conditioned upon [the plaintiff] dismissing his existing EEOC charges." *Id.* at *3. With reliance on *Knox*, 957 F.3d 1237, summary judgment was denied because pretext was a jury question.

Below, despite the self-evident similarity between this case and *Baskerville*, the district court distinguished *Baskerville*. DE 108. It did so for mistaken reasons. The district court below wrote that "the *defendant* in *Baskerville* had not discussed the [LCA] with the plaintiff." *Id.* at p.23.

---

[7] DE 79 pp.11-12 (summary-judgment opposition citing *Baskerville*).

But that's not accurate. The balance of the *Baskerville* opinion makes clear that some agent of the defendant *did* discuss the LCA with the plaintiff, otherwise it would not have been possible for plaintiff to have "declined to sign the Last Change Agreement offered by OVAMC [i.e., the defendant]." *Baskerville,* 2021 WL 1338203, at *2. Thus, the primary reason for which the district court distinguished *Baskerville* appears to be a misunderstanding of the *Baskerville* facts.[8]

In this case, it is beyond dispute that the LCA was premised on Ms. Salabarria's withdrawal of the second EEOC charge: the Settlement (executed contemporaneously with the LCA) mandates dismissal of the EEOC charge. DE 71-4 at pp.1-2. Thus, as in *Baskerville*, the plaintiff's LCA was conditioned on the dropping the EEOC charge—i.e., forgoing protected activity. Therefore, summary judgment on pretext was improper. *See Baskerville*, 2021 WL 1338203, at *2; *Knox,* 957 F.3d at 1246; *Goldsmith,* 513 F.3d at 1268; *Gate Gourmet, Inc.*, 683 F.3d at 1260.

---

[8] The district court most likely based this misunderstanding on the portion of the *Baskerville* opinion stating that a particular agent of the defendant, Liezert, "did not discuss the [LCA] or the Removal with plaintiff." *Baskerville,* 2021 WL 1338203, at *1. But that's not synonymous with no *agent* of the defendant discussing the LCA with plaintiff; and it's impossible to understand how the plaintiff could have "declined to sign" the LCA without first discussing it with someone.

The biggest distinction between this case and *Baskerville/Knox* is not one the district court identified: Ms. Salabarria **accepted** the LCA and was then fired, whereas plaintiffs in other cases **rejected** the LCA and were then fired. *See Knox*, 957 F.3d at 1246 ("a plaintiff could establish a causal connection . . . when an employer responds to an employee's discrimination complaint by conditioning the employee's continued employment on a release of claims and then fires the employee for rejecting the release."). Indeed, review of *Knox* and progeny show this to be the paradigmatic fact pattern. *See Brazell v. Hillsborough Cnty. Bd. of Cnty. Commissioners*, 522 F. Supp. 3d 1165, 1178 (M.D. Fla. 2021) (substantially similar statement of law to *Knox*).

But there is good reason this distinction (between acceptance/rejection of the LCA) does not negate Ms. Salabarria's reliance on *Baskerville* or *Knox*. Regardless of whether Ms. Salabarria accepted the LCA, the City nevertheless conditioned continued employment on the dismissal of an EEOC charge. And it is the employer's *motivations* for its actions—not the employee's response to those actions—that are the focus of the pretext inquiry. That the City conditioned the LCA on Ms. Salabarria dropping her EEOC charges does

29

not *unbecome* evidence of its animus against protected activity just because she **accepted** the LCA.

Indeed, Chief Clements' deposition strongly suggests that he is aware that it was improper for the LCA to be executed in conjunction with Ms. Salabarria dismissing her EEOC claim, which is why he felt obliged to make the objectively false claim that the LCA "was <u>not</u> in conjunction with the EEOC" charge. DE 69-16 Tr. 79:12-80:1 (emphasis added); *see also* Tr. 146:11-24 (similar testimony). Of course, this is false. The Settlement, executed contemporaneously with the LCA, mandates dismissal of the pending EEOC charge. DE 71-4 at pp.1-2. They *were* executed "in conjunction" with one another; to testify otherwise suggests awareness that they should <u>not</u> have been.

Additionally, it is anticipated that the City will continue arguing that there can be no pretext associated with the LCA because Ms. Salabarria negotiated the LCA and Second Settlement with advice of counsel. *See* DE 108 pp. 5, 23. Such emphasis on Ms. Salabarria's role negotiating the LCA is misplaced.

That Ms. Salabarria negotiated the settlement package does not negate how the City conditioned continued employment on the dismissal

30

of her EEOC charge. Clements' testimony shows that Ms. Salabarria would have been fired if she refused to drop the EEOC in exchange for continued employment under an LCA. He testified that the LCA was "a second shot at *what would have [otherwise] been* something that was a final decision on their employment." DE 69-16 Tr. 48:4-8. Ms. Salabarria's testimony shows the same. DE 69-17 Tr. 132:12-18 ("I felt forced.").

Also, regardless of Ms. Salabarria's acquiescence and agreement to the LCA/Settlement, Ms. Salabarria only came to the negotiation table *after* Chief Clements' elaborate misinformation scheme, which was designed to give all lawyers involved the misimpression that (1) Ms. Salabarria herself had come up with the idea of dropping her EEOC charge in exchange for dismissal of her IA complaint and LCA, and (2) that Chief Clements had <u>not</u> had backchannel communication with Ms. Salabarria (through third-parties) about her EEOC charge. DE 78-3 ¶¶6,7-12, 13-16. But in reality, predicating the dismissal of Ms. Salabarria's EEOC charge on the LCA was Chief Clements' idea; and Chief Clements <u>did</u> use backchannels to communicate with Ms. Salabarria about her pending EEOC charge. *Id.*

31

Even if it was permissible for the City to predicate continued employment under an LCA on dismissal of EEOC charges, the (1) very act of so-conditioning, and (2) great lengths to which the City went to so-condition, indicate that Ms. Salabarria's eventual firing pursuant to that LCA was retaliatorily motivated by her exercise of protected activity.

**C.　The City's Deviations from Protocol to Bring About The LCA—and Then Termination Pursuant to the LCA—Makes Pretext a Jury Question.**

"When attempting to show pretext, the fact that an employer has departed from established guidelines or procedures may be evidence that it has attempted to conceal discriminatory motives." *Wellons v. Miami Dade Cnty.*, 611 Fed. Appx. 535, 540 (11th Cir. 2015). A run-of-the-mill deviation from protocol does not establish pretext; the deviation must have somehow "occurred 'in a discriminatory manner.'" *Connelly v. WellStar Health Sys., Inc.*, 758 Fed. Appx. 825, 829 (11th Cir. 2019) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002)).

Here, the biggest discriminatory deviation from protocol was Chief Clements' elaborate misinformation scheme. DE 78-3 ¶¶6,7-12, 13-16. The goal of his scheme was to get Ms. Salabarria to drop her EEOC charges and agree to be bound by an LCA—making her a worry-free

32

target for termination. The means of achieving the goal included: backchannel communications through third parties; cajoling Ms. Salabarria's actions by pressuring her fiancé, Mr. Guasto; and repeated assurances that everything would be okay if Mr. Guasto and Ms. Salabarria heeded Chief Clements's advice so as to avoid unwanted attention from the City's outside counsel. *Id.* Chief Clements—the ultimate decision-maker—went to great lengths to "attempt[] to conceal [his] discriminatory motives." *Wellons,* 611 Fed. Appx. at 540. His abnormal behavior occurred in a "discriminatory manner" because the end goal was to get Ms. Salabarria to drop a pending EEOC claim. *Connelly*, 758 Fed. Appx. at 829 (quoting *Rojas*, 285 F.3d at 1344 n.4).[9]

The next biggest deviation from protocol is that Ms. Salabarria—based on the record evidence—is the only person with whom the City has ever conditioned dismissal of an IA Investigation on an employee dropping EEOC charges. DE 69-30, ¶¶38-47. She appears to be the only

---

[9] Appellate preservation note: Ms. Salabarria's trial counsel relied on Chief Clements' misinformation scheme as evidence of pretext, but used different nomenclature when describing those events, like "Clements' threatening statements" and Clements "using third party individuals." DE 79 p. 19. This is a stylistic difference in nomenclature, not a substantive difference in legal argument.

one. Although the City's HR Director provided an affidavit stating that LCA's are "not rare" in that "42" of them had been issued between 2015-2022, there is no indication that any of those other 42 LCA's also required the employee to drop a pending EEOC charge in exchange for remaining employed under an LCA. *See id.*[10]

There are also several smaller deviations from protocol—which occurred in the course of her termination—illustrating that Ms. Salabarria's firing pursuant to the LCA was part of a preconceived animus against her EEOC activity. For example, Cosner (on the wrong form) reported Ms. Salabarria—not up the chain of command—but to the City's outside counsel. DE 69 ¶42; DE 78 ¶107. That's odd.

If Cosner truly didn't know about the LCA, then there would have been no reason for him to circumvent the chain of command and report Ms. Salabarria—not up the chain of command—but to the City's outside counsel. Either Cosner *knew* about Ms. Salabarria's LCA (contrary to his testimony, DE 69-6, Tr. 147:4-1, and consistent with Ms. Salabarria's

---

[10] Appellate preservation note: Ms. Salabarria's trial counsel argued that the conditioning of the LCA/Settlement on dismissal of the EEOC charge was evidence of pretext, even if the affidavit from the City's HR Director was not relied upon. DE 79 p. 19.

34

testimony, DE 69-17, Tr. 109:7-111:18), or he was instructed by someone to do so in part of an orchestrated attempt to terminate Ms. Salabarria. This second theory is consistent with the City asserting an attorney-client privilege objection when Cosner was asked "why he sent" the AAF to the City's outside counsel. DE 69-6, Tr. 55:6-25; *see also* DE 79-9 (Cosner's email to Internal Affairs—two minutes after communication to City's outside counsel—stating: "I was advised to forward this to you.").

Considering these deviations occurred within the exact chain of events leading to Ms. Salabarria's termination, they occurred in a "discriminatory" manner. *Connelly*, 758 Fed. Appx. at 829 (quoting *Rojas*, 285 F.3d at 1344 n.4).All of this, under *McDonnell Douglas*, 411 U.S. at 802 n.13, or otherwise, creates a triable issue of fact as to pretext.

## <u>CONCLUSION</u>

For the foregoing reasons, Ms. Salabarria respectfully requests that this Court reverse.

Respectfully submitted,

August 15, 2025

<u>/s/ Michael J Ellis</u>
Michael J Ellis
Fla. Bar No. 1025056
Alexander Appellate Law P.A.

1022 Park Street, Suite 206
Jacksonville, FL 32204
(689) 259-5010
michael@alexanderappeals.com
service@alexanderappeals.com
*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

**1. Type-Volume**

This document complies with the word limit (13,000 words) of Federal Rule of Appellate Procedure 32(A)(7)(b)(ii), because, excluding the parts of the document exempted by Rule 32(f), this document contains less than 7,400 words.

**2. Typeface and Type-Style**

This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word's 14-point font Century Schoolbook.

August 15, 2025

<u>/s/ Michael J Ellis</u>
Michael J Ellis
Fla. Bar No. 1025056
Alexander Appellate Law P.A.
1022 Park Street, Suite 206
Jacksonville, FL 32204
(689) 259-5010
michael@alexanderappeals.com
service@alexanderappeals.com
*Counsel for Appellant*

37

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15, 2025, I electronically filed

the foregoing with the Clerk of the Court by using the CM/ECF system,

which will send notice of electronic filing to all counsel of record.

Daniel J. Barroukh, Esq.
Fla. Bar. No. 1049271
danielb@dereksmithlaw.com
**DEREK SMITH LAW GROUP PLLC**
520 Brickell Key Drive
Suite O-301
Miami, FL 33131
*Appellant's Trial Counsel*

Michael L. Elkins, Esq.
Florida Bar No. 523781
melkins@mlelawfirm.com
**MLE LAW**
1212 NE 16th Terrace
Fort Lauderdale, FL 33304
Telephone: 954.401.2608
*Co-Counsel for Appellee*

Henry Hunnefeld, Esq.
Florida Bar No. 343811
henryhunnefeld@miamibeachfl.gov
Benjamin J. Braun, Esq.
Florida Bar No. 1017937
benjaminbraun@miamibeachfl.gov
**CITY OF MIAMI BEACH CITY ATTORNEY**
City Attorney's Office
1700 Convention Center Drive
Fourth Floor- Legal Department
Miami Beach, FL 33139
*Co-Counsel for Appellee*

/s/ Michael J Ellis
Michael J Ellis
Fla. Bar No. 1025056
Alexander Appellate Law P.A.
1022 Park Street, Suite 206
Jacksonville, FL 32204
(689) 259-5010
michael@alexanderappeals.com
service@alexanderappeals.com
*Counsel for Appellant*